Good morning and may it please the court. I'm Justin Pierce on behalf of the defendants in this action and the appellants. Today I'm representing specifically the individual defendants in this action. Dr. Glasper, who is the chancellor of the Maricopa County Community Colleges District, and Dr. Randolph, who is the now former president of Glendale Community College. I'll watch my time, but I'd like to reserve three minutes for rebuttal, Your Honor. Chancellor, would you tell us what the district's policy was on which you rely? Exactly what was it? The district's policy at the time allowed e-mail communication, and at the time it was important that this new communication policy or process be advanced in the district. Excuse me, what was the policy? Would you like to tell us? The policy was that e-mails could be exchanged over the Internet server that related to, I think we submitted it in our briefs, but the essence of it was school-related purpose, business-related purpose, and several other things that the way the district interpreted the policy, Justice O'Connor, which I believe is perhaps the more important question, because what was being done was the e-mails were allowed to be exchanged over a number of different items. Are you claiming that the policy as it was written violates some federal law? No, Your Honor. Do you claim that the policy as it was interpreted by the district violates some federal constitutional or other provision? No, Your Honor. We believe that the policy as it was written was just fine. What it was was it was very open, and people used the Internet or the e-mails to exchange various different ideas from the sale of a condo to the whole thing. So you have no objection at all to the policy as it was written or interpreted? No, Your Honor. We don't believe that it violated any law. What happened was, as a result of the situation here, the district looked at the policy to say, do we need to tighten this up? Do we need to make this more clear that what we really want to limit exchanges to are those issues significantly affecting district business? And that was what the process was that went into effect. But to answer the question of whether the policy initially had any problems, no, there were no problems with it. Let's say, just following up on Justice O'Connor's question, just to make it a little more concrete, let's say that contrary to what actually happened, the district decided to punish the professor for that, for those e-mails. It chose not to, and I understand those are the facts. But let's say it had said we really want to and we think we should punish the professor. Would there have been a basis under the policy as it then existed for such punishment? And how do you think it would have played out in terms of those proceedings? Judge Kaczynski, the hypothetical is- Speak up. It's very hard to hear you. Are the microphones plugged in? I'll speak louder. Is this better if I speak louder? Yes, it is. Thank you. The hypothetical that you've presented is one that we've considered many times. What if the district had done something? Did the policy allow for the district to take action? Now, the policy, as with many other employment policies, would have allowed action to, for example, let's say the e-mails had had pornographic material and sent that. Of course, the district could have taken action against Professor Kachowski and said you cannot send these sorts of e-mails across the server. That's what the policy would have allowed. You need to get closer to the microphone. Sorry, I'm- What's the matter with the mics? I think it needs to talk louder. I'm getting about as close as I can, Your Honor. I'm sorry. So the policy, can you hear me now? The policy would have allowed the district to take steps versus pornographic e-mails, but did not allow steps for overtly racist statements? Your Honor, if there were overtly racist statements in the e-mail, then yes, because obviously Title VII would come into play at that point. Somebody could not send an e-mail across, for example, and I can think of numerous examples that would be racist issues that could then create a claim for a hostile work environment. But the underlying issue here is we're not talking about those types of e-mails. What we're talking about- You know, this is really unusual. Usually I give somebody a hypothetical and say this is not that case. My question was let's talk about this case. You say, oh, this is not this other case. But what is the answer to the question I asked, which is don't assume other e-mails. Let's not talk about pornography or, you know, any other thing that you would, you know, characterize as overt racism. Okay, but let's talk about these e-mails. Could the district have disciplined the professor for these e-mails? No, Your Honor. Okay. Why don't you tell us why? And then go ahead and answer the question about what would happen if there were different racist e-mails, or what you consider to be- Thank you. What about these e-mails? Why couldn't they have punished him for these e-mails? These e-mails, the Supreme Court has held consistently that political speech is at the core of First Amendment protection. And when- Let's start with the policy. And I understand there was a First Amendment issue and it needs to be considered. But under the policy as it was written at the time, as it was understood and applied at the time, just under the policy, could he have been, was it a violation? Well, the policy allows, and so I guess if I understand your question correctly, Judge Kaczynski, the policy certainly allows for the district to discipline an employee for inappropriate use of the e-mail system. Can the college discipline someone for exercising their First Amendment right of free speech? Of course not, Your Honor. Well, why isn't this right in that category? Doesn't the speaker apparently felt that there was too much advantage being given to Hispanics or something? Why couldn't he say so? That's exactly the point we've been making from the very beginning in this case, Your Honor. Well, let's hear it. Well, the argument that we have, Your Honor, is that you have a college professor at an institute of higher education who takes issue with the fact that the district is apparently endorsing an event called Dia de la Raza. This professor expresses his view to the rest of the employees in the district that this is an explicitly racist event. Does he have a First Amendment right to take that position? Yes, Your Honor, he absolutely does. Does he think the district has an obligation to discipline him for exercising a First Amendment right? Your Honor, we believe that had the district done that, the district would be facing a First Amendment claim by Professor Kahowski that is truly viable. It would have been very difficult to defend because the question would have been, as an attorney, if I had been asked, hey, we just disciplined this professor because he sent these three emails expressing these political views that he disagrees with multiculturalism, diversity, affirmative action, I would have said, I think you've got a problem. Well, then why are you suing to compel the district to do something that you think would be a First Amendment violation? I don't understand your claim. We're not, Your Honor. I represent the individuals and the district, which is the chancellor of the district and the Glendale Community College professor, I'm sorry, Glendale Community College president, who have been sued by the plaintiffs saying you should have done something to Professor Kahowski. And you say they didn't have to because it would clearly violate the First Amendment. That's exactly right, Your Honor. What we're saying is. Is your answer different if it is racist? And I stumble over that word because previous claim this is racist speech, but you said there was something else that was clearly racist speech. And you think that would be different? And I have that question, too. Why is this speech not racist? He is saying the emails are saying or are linking to things saying the superiority of Western civilization, that Western civilization is superior to others and basically making comments about how multiculturalism and people of color are somehow inferior. Is it your position that that is not enough to at least create a hostile environment as to those statements? That's right, Your Honor. When you look at the case law, the test for severe pervasive conduct, and even at the core whether it's racist to begin with, when you look at what he's saying, what his arguments are, and we're not here to debate whether his arguments have merit. What we're here to debate is are those arguments, is what he's putting forward, is it political speech? And what he's done is he's cited Pulitzer Prize winning authors. He has cited doctors of philosophy from across the United States. And he's included links, of course. Here, if you'd like to read more about why multiculturalism is a problem in our universities or other things, here's a link and you can read that. He's presenting his political opinion in that regard. And so certainly when we're talking about issues of multiculturalism, diversity, affirmative action, we're always going to be talking about race and other things. The question is, is it racist? I think there's a big difference, and in the case law there's a big difference between a professor. I will give an example. Had Professor Kahowski sent an email to the district and said, and used some racial epithets and said, we're going to burn crosses out and we're going to kill all of the, pick your terrible word, that would not have been protected speech. But let me just ask you another hypothetical. Assuming that these comments were offensive and racist, did, I guess it was President Randolph and Chancellor Glasper, is that correct? That's right. Our case law says if they know, if a superior knows of this sort of racism or sexism and acquiesces, takes no action, then they can be held liable. Is there a reason, assuming that these were racist comments, that they should not have liability under this situation? Well, when you look at the test for qualified immunity, basically what the Supreme Court has said is qualified immunity is there to protect all but the plainly incompetent and those who knowingly violate rights. And so the question would be, does the evidence here suggest or can it stand for the proposition that these individuals absolutely knew that this was a racially hostile work environment and they did nothing as a result? If that was the evidence, then I think that there could be a case. The problem is here when you look at the context and the contours of the right, whether the right was clearly established in light of the First Amendment concerns that these individuals had to weigh, which is undisputed, the parties have... You've got two minutes left. Would you like to say that? Not to cut into your arbor there. Yes, I'll wrap it up. But the bottom line is we believe that given the contours of the right, these individuals were placed in a very difficult position, which is exactly what the doctrine of qualified immunity is meant to protect. I'd like to reserve the remainder of my time. Thank you. We'll hear from the closing counsel now. Good morning, Your Honor. My name is Thomas Saenz and I represent the plaintiffs' appellees in this action. I think the most interesting issue that's raised on this interlocutory appeal on the denial of qualified immunity for the two individual officers of the college is the First Amendment issue. However, that First Amendment issue is based on a faulty factual premise and based on faulty legal conclusions. First, with the faulty factual premise, it's basically based on the college's contention that the plaintiffs were seeking punishment, sanction against Mr. Kahowski and that absent that punishment or sanction, there would not be a violation of their right to be free of racial harassment. Well, you do claim that college did something wrong. Yes. The college failed to respond appropriately, but there are a number of steps the college could have taken and did not take. Well, didn't the president send some e-mail around himself? He sent an e-mail, Your Honor, that basically said the First Amendment protects this speech and I am going to do nothing to prevent it from continuing to occur. He said he disagreed also. He said he disagreed, but he said this is protected and I will do nothing to prevent it from continuing. The chancellor issued a press release to basically the same effect. So did the professor who sent the offending e-mail have a First Amendment right that he was exercising? He did not because this was a non-public forum. If the professor had expressed these opinions, these views, in another context, in another forum, yes, it would likely have been protected First Amendment speech. But in the non-public forum that the college created with a technology policy that initially looked very much like the policy that they adopted later on, limiting it to matters germane to the educational purpose of the college and making clear that, yes, the professor could be sanctioned by terminating his access to the listserv. Had they done that at the time? I'm sorry? Had that been the policy at the time? Did the professor know that he should be disciplined for sending something like he sent? It was the written policy. As the college's counselors indicated, there are questions about what the practice at the time had been. They apparently had not taken steps to enforce their written policy. They took those steps a year later to actually basically put forward the same policy in writing and then indicate that they were going to enforce it. But a critical point, Your Honor, is that they could have taken action in response, in response to this racial harassment that did not involve sanctioning Kahowsky if that is a concern. They could have, for example, immediately put in place a regime under which they enforced the existing policy. But how can you hold them liable for what they could have done? Don't you have to focus on what they did or did not do? Yes, and in this case, what they did not do, they did not do anything except to indicate that the professor by the president saying he didn't agree, wasn't there? Yes, but that is tantamount to doing nothing to stop the harassment. It just indicates I disagree with this. But how was an email by someone who didn't have any enforcement authority over employees saying he thought LAVASA was an unfortunate celebration, how should that be the responsibility of the college under the policies that it had? Because the college is the employer and has a responsibility to enforce the right that they agree was clearly established to be free from racial harassment that creates a hostile work environment. Now that means if you become aware that the harassment has occurred, that you must take appropriate action calculated to end the harassment. In this case, appropriate action would have minimally meant that from this point forward, we are no longer going to permit uses outside of the technology policy of this listserv and of the websites. A step they took a year later. If they had taken it right when this occurred, that would have been calculated. But we're talking about when it occurred. You're claiming some economic liability based on the circumstances at the time where it hadn't been enforced. And the president said I don't agree with this statement. Okay, let's put this in the context of another workforce. Well, let's put it in the context here. That's what I'd rather do because we have to deal with that. If an employee was being harassed by another employee and the employer responded by simply saying to everyone. But you don't claim there was any individual harassment of anybody. You're saying this e-mail by the professor somehow amounted to harassment of everybody. It amounted to creating a hostile work environment. Yes, that's correct. That isn't the standard. Extremely pervasive. I'm sorry. Extremely severe. It has to be severe and pervasive. One e-mail by one professor. And this was the first one would have been the last e-mail. All right. That's saying it means the race and the race is racist. That's the first e-mail, yes. Right. And is your position that that was severe and pervasive? The standard, I believe, is severe or pervasive. It is certainly clear that it was pervasive. You cannot come up with something that's more pervasive than an e-mail that goes to everybody. Pervasive does not mean it goes to everybody. Pervasive means it's all around you. The pervasive cases have said a person can't walk in without being taunted for being a female or for being black or whatever. You can't get to a desk without having somebody slap your panty. No, I mean, those are real cases where that's what pervasive means. You can't get to the work day without having a lot of people constantly harassing you. And in this case, one e-mail or even three e-mails strike me as from one single professor with whom most of these employees didn't have any face-to-face contact strikes me as hardly severe or pervasive. But as you know, Your Honor, this is a decision that's to be made considering all of the circumstances. And it is certainly pervasive in the sense that any employee, any Latino employee working in the college, has no idea who's read the e-mail that day that disparages their racial group or that in the context of the other two e-mails discusses the supremacy of another race and then disparages the race that the Latino employee belongs to or that has links to allegations of conspiracy theories on the part of the race that that employee is a part of or that in the last e-mail openly calls for discrimination against that racial group. How is a claim that a particular policy is racist itself become racial harassment? The disparagement of Via de la Raza coupled with the later e-mails that describe the Let's talk about the first one because you say after the first one he was required to do something. So we've got to, you know, if you want to say after the second one, we can talk about that. But your position was that after the first one, there was harassment. He was required to take, they were required to take steps. If that's what I said, Your Honor, I misspoke. I'm talking about the three e-mails together. That's when it was brought to the attention of the two individual defendants here when they then had an obligation. They did take action and nothing further happened to the third e-mail. So haven't you just talked yourself out of court? There was a fourth e-mail from another professor and that occurred precisely because they did not immediately implement a policy to enforce their pre-existing technology policy that limited the use of the listserv and the website. So your position is that you take the three e-mails together to establish a harassment claim and it's the fourth one that winds up being the violation. No. The third, the three create the violation if appropriate action is not taken that is calculated to end the harassment. I'm citing the fourth as a empirical indication that in fact it didn't end the harassment. Let me make sure I understand that. So your position is even if there had been a fourth e-mail, if they don't take immediate steps, because they did eventually take steps, right, if they don't take immediate steps to prevent further harassment conduct, they are in violation even though there's no further harassment at all. In the context of this case, yes. What the case law says is you must take appropriate action calculated to end the harassment. What is your best case in support of your position, please? Your Honor, I believe that all of the cases say that that's the standard. I don't think that there is a case that is factually as closely related. Even remotely close to this? No, Your Honor. I don't think that there's a case that involves distribution of racial harassment to every employee that an employer has. I've not seen one. What I've seen are posted notices, individual letters given to a plaintiff. The e-mail was initiated by a professor who had no responsibility as an employer. Yes, but the law makes clear that co-employees' colleagues can engage in harassment as well, and that it is the employer's responsibility to take appropriate action reasonably calculated to ensure that that does not continue. Yes, but what case do you rely on to say that an e-mail like this that the head of the college said, I don't agree with at all, amounts to harassment? I want to know what case you rely on, if any. Your Honor, I haven't seen a case that involves e-mails that go to an entire workforce. This is a unique situation in that regard. In that regard, it is more pervasive than any case that I have seen, because it involves something that goes to every employee in the workforce. It involves something that goes to every employee, and a Latino employee has no idea whether a person they're interacting with has done it or not. Do you think that the other professors there have some First Amendment rights of their own to say things that the rest of us find offensive? All of the professors, including Mr. Kahowski, have that right, but not in this forum. This is a non-public forum. The district's policy makes that clear. Let's talk a little bit about non-public forum. I take it you don't take the position that, for example, they could say, I don't know when this was, but assuming this was last year, I don't remember the exact dates. You can have e-mails supporting McCain, who's a native son, but not Obama. So you can send around e-mails supporting. Of course, Your Honor, e-mails are non-public. No, no, it's a serious question. That would not be permissible. So why is it permissible for them to say you can send around e-mails favoring multiculturalism, favoring diversity, but not e-mails opposing multiculturalism and diversity? I don't believe, Your Honor, that that's what they've said, nor is it what we are saying. It sounds like it. Well, I'm sorry if that's what it sounds like. That's not our position. Our position is that as a non-public forum, or at best a limited public forum that could be withdrawn, the district's responsibility was to do what it did a year later, but in response to the harassing conduct, to immediately start enforcing its existing technology policy that limited the use of the Listserv and the website server to things that were germane to the educational mission of the college. It already had that in its policy. Its practice was not to enforce it. A year later, after lengthy deliberations... So it's basically a heckler's veto that if somebody gets offended by one discussion of an issue, one side's discussion of an issue, then the people who run the system have to shut off all discussion of that issue. So if people get offended by a discussion opposed to multiculturalism, then all discussions of multiculturalism must be shut off. But I don't agree with the heckler's veto, Your Honor. I think that this has to do with... Well, maybe... If you don't like the term, that's fine, but let's try... I don't like the concept in this regard. It's about protecting the workplace and ensuring a right to a workplace that is free from racial harassment. So any issue that one side of which might generate comments that offend somebody has to be shut down. That's what it's... You can't allow the other side to speak, so you've got to shut down both sides, right? I don't know that there are two sides when you're talking about the kind of racial disparagement that we're talking about, but let's put that aside. If there are two sides to the issue, the college already made that decision. There are two sides. I mean, racism is not a popular point of view, and a lot of people are offended by it, but it is a point of view that one can bring to bear on various issues. Do you support something that's beyond discussion under the First Amendment? The opposite point of view. The First Amendment has to do with the forum here. Again, I readily concede that if this were not a non-public forum or limited public forum, there would be complete freedom for Mr. Kahowsky to say what he wants, but that's not the case here. But what I'm saying to you is that the opposite of a racist perspective, one that disparages a racial group, that discusses the supremacy of another racial group, that has links to conspiracy theories tied to that racial group, that calls for discrimination against that racial group, the opposite of that is to be anti-racist. How do you shut that down without shutting down all discussions of multiculturalism and diversity? Well, in this case, in this forum, that's what the college had already decided to do. It was simply not enforcing it, and it's what it decided to do a year later. It did shut down all of that discussion. So you have to shut down the entire discussion of the subject because one point of view somebody finds offensive. No, Your Honor, you have to shut it down because it resulted in creating a hostile work environment because it was racial harassment. However, I want to point out that shutting down and enforcing the existing policy was one step that the two defendants could have taken and didn't. In addition, they could have indicated clearly that they were going to be looking at the issue of racial harassment and about the creation of a hostile work environment and perhaps providing training. They could have done that without any proscription by the First Amendment. Indeed, they could have started that training with the mathematics department and not run afoul of the First Amendment whatsoever. I see that I have 30 seconds left. No, no, you are actually 34 seconds to hold. Sorry. Thank you, Your Honor. You had a minute and a half and since counsel took an extra 30 seconds, we'll round you up to two minutes. Thank you, Your Honor. I think that above anything. That's OK. I'll get 30 over. I think above anything, this discussion, what has been made clear is that the discussion is made clear is that you have a chancellor and a president who are in a very difficult position. And that is exactly why the doctrine of qualified immunity is here to protect those government officials so that when they're put in these sorts of difficult positions, they can't be dragged into court and sued individually. As I said at the beginning, the Supreme Court has held that it's meant to protect all but the plainly incompetent. I cannot think that the facts that we've discussed today in this case can result in any finding that these people were plainly incompetent in what they did. In fact, this is not from the issue we have in Harper's Police Schools, is it? This was the anti-gay T-shirt case. It was high school, of course. So. Yes. And in that regard, Your Honor, that's right. That case. In fact, we cited one of your honor's statements in our brief from that case. It was vacated. The sentence was vacated. Yeah. Well. So we can take your dissent, Your Honor. It was vacuous. But the difference there is actually the court has held that the speech by students is actually less protected. What we're talking about here is a professor to not just students, but to coworkers in an institution of higher education. If I could just address two points in my last 30 seconds. One is the tortured interpretation I've now heard of the pervasive step in an analysis for harassment. Severe or pervasive. Pervasive does not mean that it was an e-mail that was. I mean, in that sense, you could have one single e-mail because it's distributed to multiple people would be considered pervasive. And that's not the test. The test is pervasive, meaning it's an ongoing sort of a thing. And I think the court identified that. My last point would be that with regard to the nonpublic forum. Basically, what they've asked is for the district to take a stance with regard to this one policy, this one instance, and ignore the fact. Thank you. Everybody else had been able to do that. Thank you very much. Thank you, Your Honor. The same counsel for a very fine argument. The case is argued. The stand submitted.
judges: O'connor, Kozinski, Ikuta